# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 27, 2012

No. 12-60052

Lyle W. Cayce
Clerk

OPULENT LIFE CHURCH; TELSA DEBERRY,

Plaintiffs - Appellants,

v.

CITY OF HOLLY SPRINGS MISSISSIPPI; BOARD OF ALDERMEN OF
THE CITY OF HOLLY SPRINGS, MISSISSIPPI; CITY PLANNING
COMMISSION OF THE CITY OF HOLLY SPRINGS, MISSISSIPPI,

Defendants - Appellees.

Appeal from the United States District Court
for the Northern District of Mississippi

Before WIENER, ELROD, and SOUTHWICK, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Until the eve of oral argument, the City of Holly Springs, Mississippi, had on its books a zoning ordinance that explicitly singled out "churches" for unfavorable treatment, albeit not for the outright banning of their presence from particular locations. The night before we heard argument, Holly Springs amended its ordinance, this time to ban "[c]hurches, temples, synagogues, mosques, and other religious facilities" from its historic and centrally located courthouse square. Opulent Life Church—which has leased property on the courthouse square but still needs zoning approval to occupy that property—filed this suit in federal district court, claiming that the (now-repealed) ordinance's

No. 12-60052

church-specific provisions, facially and as applied, violate the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*.; the First Amendment; the Fourteenth Amendment; and the Mississippi Constitution. Opulent Life simultaneously filed a motion for a preliminary injunction of the challenged provisions. The district court denied the motion on the sole ground that Opulent Life has not shown a substantial threat of irreparable harm. For the reasons that follow, we conclude that the district court abused its discretion in denying the preliminary injunction and, therefore, VACATE and REMAND.

## I.

## A.

Opulent Life Church is a fledgling Christian congregation in need of a larger meeting space. Since opening its doors in February 2011, Opulent Life has grown to about eighteen members.[1] It desires more growth but is constrained by its small building, the Marshall Baptist Center, which can comfortably accommodate only twenty to twenty-five people. The pastor of Opulent Life, Telsa DeBerry, stated in his affidavit that many potential church members have attended services but declined to join because Opulent Life's present facility is too small to accommodate them. Opulent Life's small facility has also limited its ability to operate its community service and outreach programs. For example, it can only host certain community outreach events—such as Vacation Bible School, Friends in the Park, and Movies in the Park—outdoors, when the weather permits, because its current building cannot accommodate such events.

---

[1] Most of the pertinent facts appear in the affidavit of Telsa DeBerry, who has served as Opulent Life's pastor since its founding. Holly Springs has not yet had an opportunity to present evidence to the district court because the court denied the motion for preliminary injunction a week before Holly Springs's opposition was due and before Holly Springs had responded. Opulent Life appealed the next day.

No. 12-60052

According to Opulent Life, these space limitations substantially impair its ability to fulfill its religious mission. Opulent Life's mission statement is as follows: "to engage all in our sphere of influence with the Gospel of Jesus Christ that we may encounter the called and lead them to be in right standing with God and man." According to Pastor DeBerry, fulfilling this mission requires regular worship services, community activities and outreach, and welcoming individuals who wish to participate in Opulent Life's activities. Consequently, Opulent Life considers it "of vital importance to [its] religious mission that it maintain a facility large enough to accommodate a growing congregation."

Because of the inadequacy of its present building, Opulent Life has sought a more spacious facility for the past sixteen months. Opulent Life launched this search in March 2011, the month after its founding. Soon Opulent Life identified a suitable property in Holly Springs's central business district, on the courthouse square. In August 2011, Opulent Life entered into a lease agreement to use the property as a church. By its terms, the lease will commence when Opulent Life obtains the proper land use and building renovation permits from Holly Springs. The lessor filed an affidavit in this court in early May averring that he is experiencing significant financial hardship, that he urgently needs rental income from the property, and that he will have no choice but to terminate the lease agreement if Opulent Life cannot soon occupy the property.

Less than a month after signing the lease, Opulent Life applied for a renovation permit and submitted a comprehensive building plan to the Holly Springs City Planning Commission. The Commission tabled the request at a meeting held a few days later. Its stated reason for doing so was that Opulent Life had failed to meet the (now-repealed) requirements of Holly Springs's zoning ordinance that apply only to churches (hereinafter "Section 10.8").[2] The

---

[2] Section 10.8 only singled out churches, and not other religious facilities, unlike the newly adopted ban, which applies more broadly to "[c]hurches, temples, synagogues, mosques,

3

No. 12-60052

Commission did not indicate which provisions of Section 10.8 Opulent Life failed to meet, but it did provide Pastor DeBerry with a copy of those requirements. It is Pastor DeBerry's belief that Opulent Life failed to satisfy Section 10.86, which required that sixty percent of property owners within a 1300-foot radius approve the property's use as a church, and Section 10.89, which required Opulent Life to obtain approval from Holly Springs's mayor and Board of Aldermen.[3] The entirety of the zoning ordinance's church-specific provisions are as follows:

> 10.8   Churches
>
> Churches where permitted in the City of Holly Springs, shall conform to the following standards:
>
> 10.81 The amount of traffic generated and on site parking accommodations by the proposed facility must be located on a through street;
> 10.82 Ingress and egress to the property and proposed structures thereon with particular reference to automotive and pedestrian safety and convenience, traffic flow and control, and access in case of fire or catastrophe;
> 10.83 Plans must show assurance that noise levels shall not disturb the neighborhood in which the facility is proposed to be located;
> 10.84 The proposed scale and context of the associated activities and facilities;
> 10.85 A site plan shall be submitted in conformance with the site plan standards of this ordinance;

---

and other religious facilities."

[3] The list of church-specific requirements that the commission gave Pastor DeBerry differs in a few minor respects from the requirements in the actual zoning ordinance. Opulent Life had to file a Mississippi Public Records Act request to obtain a copy of the entire zoning ordinance because prior to that request, the Mayor of Holly Springs, Andre DeBerry, informed Pastor DeBerry that the ordinance was a controlled document that he would not release to Opulent Life.

No. 12-60052

> 10.86 Survey of the property owners within a 1300 foot radius with 60% approval;
>
> 10.87 Sign must be located on building only and have no lighting in residential districts;
>
> 10.88 Must be minimum of 25,000 square feet in B-4 zones;
>
> 10.89 Final approval must be granted by the Mayor and Board of Aldermen.

The zoning ordinance imposes "supplemental standards" for several other uses, including home occupations, junkyards, mini-warehouses, bed and breakfasts, and mobile home parks. Prior to the recent amendments to the ordinance, however, only churches were subject to approval by neighboring property owners and the mayor and Board of Aldermen.

Opulent Life filed suit on January 10, 2012. Its complaint seeks a declaration that Section 10.8 of the zoning ordinance violates RLUIPA facially and as applied,[4] the First Amendment to the U.S. Constitution facially and as applied, the Equal Protection and Due Process Clauses of the Fourteenth Amendment facially and as applied, and the Mississippi Constitution facially and as applied. The complaint also seeks injunctive relief to prevent Holly Springs from enforcing Section 10.8 or "the remainder of the Zoning Ordinance to impose limitations on churches not applicable to other nonreligious entities." Finally, the complaint seeks actual damages and attorney's fees.

With its complaint, Opulent Life filed a motion for a preliminary injunction to enjoin enforcement of Section 10.8. In support, it attached an affidavit of Pastor DeBerry, explaining, *inter alia*, the harm that Opulent Life believes it is suffering because of Holly Springs's decision to table the church's permit request until it can satisfy the zoning requirements that apply to

---

[4] Opulent Life alleged violations of RLUIPA's Equal Terms Clause, 42 U.S.C. § 2000cc(b)(1); Substantial Burden Clause, § 2000cc(a); Nondiscrimination Clause, § 2000cc(b)(2); and prohibition against unreasonable limitations on religious land uses, § 2000cc(b)(3).

No. 12-60052

churches.

Just seven days later, the district court denied the motion for preliminary injunction in a two-page order. The district court based its ruling entirely on its conclusion that Opulent Life had not shown a substantial threat of irreparable harm. The entirety of its reasoning is as follows:

> It appears that the plaintiffs are still able to meet at their current location, Marshall Baptist Center. They seek to use the rented building in anticipation that their membership will grow. As the plaintiffs are not currently being deprived of the right to freely exercise their religion, the court fails to see irreparable harm if the injunction is not granted.

The district court entered its order before Holly Springs had responded to the complaint or preliminary injunction motion. Pursuant to local rules, Holly Springs's opposition was not due until fourteen days after the motion's filing. Opulent Life filed its notice of interlocutory appeal the day after the district court entered its order.

B.

Holly Springs amended its zoning ordinance on August 7, 2012, the night before oral argument. Counsel for Holly Springs advised this court that Holly Springs had been working on a new zoning ordinance for more than a year.[5]

In amending its ordinance, Holly Springs repealed Section 10.8 and

---

[5] According to counsel for Opulent Life, on the Friday before oral argument, Holly Springs notified Opulent Life's counsel of its intention to amend its ordinance the following Tuesday evening, and provided a draft of the ordinance it intended to adopt. On the morning of oral argument, Wednesday, August 8, 2012, Holly Springs informed Opulent Life's counsel that it had passed the ordinance the night before. It did not give opposing counsel a copy of the enacted version of the new ordinance before oral argument.

At oral argument, counsel for Holly Springs conceded that Holly Springs never informed the district court or this court of its intention to amend its ordinance. Holly Springs also neglected to file a copy of the amended ordinance prior to oral argument. This court instructed counsel to file a copy by the end of the week, pursuant to Fed. R. App. P. 28(j). Holly Springs complied on Friday, August 10.

No. 12-60052

replaced it with a new provision that categorically bans "[c]hurches, temples, synagogues, mosques, and other religious facilities" from the newly created "Business Courthouse Square District." This new district includes the property leased by Opulent Life. The stated purpose of this new district "is to designate the area . . . for certain retail, office and service uses which will complement the historic nature and traditional functions of the court square area as the heart of community life." Yet while religious facilities are not welcome, other noncommerical uses are. For instance, libraries, museums, and art galleries are all permitted on the courthouse square.

## II.

Before turning to the merits of Opulent Life's appeal, we must ensure that this case is justiciable in its present posture. Holly Springs argues that this case is at once moot and unripe.[6] We address these justiciability challenges in order.

## A.

At oral argument, Holly Springs argued that its repeal of Section 10.8 of the zoning ordinance renders this case moot—while simultaneously urging us to adjudicate the facial validity of the new ordinance. Opulent Life responded that Holly Springs's mootness contention is refuted by the Supreme Court's decision in *Northeastern Florida Chapter of Associated General Contractors v. City of Jacksonville*, 508 U.S. 656, 661–63 (1993).

This case is materially identical to *Associated General Contractors*. There, the Court granted certiorari to decide whether the petitioner had standing to challenge Jacksonville's minority set-aside program for city contracts. *Id.* at 658.

---

[6] Despite raising these justiciability challenges to the old ordinance, at oral argument Holly Springs urged us to decide the facial validity of the new ordinance. We asked whether Holly Springs "want[ed] us to construe the current ordinance as to whether it's facially appropriate under RLUIPA or not," and counsel for Holly Springs responded: "The new ordinance? Uh . . . we would. . . . Yes. . . . I believe that judicial economy would require that you do that."

No. 12-60052

After the grant of certiorari, Jacksonville repealed its ordinance and replaced it with a different albeit similar set-aside program. *Id.* at 660–61. The Court held that the repeal of the prior ordinance did not moot the case, relying on its prior decision in *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982), where the Court "applied the 'well settled' rule that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Associated General Contractors*, 508 U.S. at 661–62 (quoting *City of Mesquite*, 455 U.S. at 289). This mootness exception applied in *City of Mesquite* "because the defendant's 'repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated.'" *Id.* at 662 (quoting *City of Mesquite*, 455 U.S. at 289).

In rejecting the mootness challenge, the *Associated General Contractors* Court described its facts as presenting "an *a fortiori* case" to *City of Mesquite*. *Id.* It explained that:

> There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so. . . . The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to black- and female-owned contractors . . . it disadvantages them in the same fundamental way.

*Id.* Here, as in *Associated General Contractors*, Holly Springs has already repeated its allegedly wrongful conduct. Instead of imposing special burdens on Opulent Life before it can occupy its leased property, Holly Springs has doubled down and banned Opulent Life from the property altogether. This may present an even weaker case for mootness than *Associated General Contractors*. Regardless, the case is not moot.

This case is also not moot for another reason. In challenging the validity

8

of Section 10.8, Opulent Life seeks retrospective as well as prospective relief.  It sought to have enforcement of Section 10.8 enjoined, but it also seeks actual damages and attorney's fees.  *See* 42 U.S.C. § 1988(b) (authorizing attorney's fees for prevailing parties in RLUIPA cases).  This alone is enough to ensure that an actual live controversy exists between the parties, for which a court may grant "effectual relief."  *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) ("A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing 'party.'" (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)); *see Knox*, 132 S. Ct. at 2287 ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." (alteration and internal quotation marks omitted)); *see also* Erwin Chemerinsky, Federal Jurisdiction § 2.5.2 (6th ed. 2012) ("[A] plaintiff seeking both injunctive relief and money damages can continue to pursue the case, even after the request for an equitable remedy is rendered moot." (collecting Supreme Court cases)).

B.

Holly Springs also argues that this case is unripe.  Ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n.18 (1993).  It is "peculiarly a question of timing," *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974), whose "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)*, abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Determining whether a claim is ripe for judicial review requires the evaluation of (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149.

No. 12-60052

Holly Springs does not argue that Opulent Life's claims are unripe under these ordinary ripeness considerations, but instead that Opulent Life has not satisfied a prudential ripeness requirement set forth in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). *See Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 89 n.2 (5th Cir. 2011) (collecting Supreme Court cases for the proposition that *Williamson County*'s ripeness requirements are prudential). Under *Williamson County*, Fifth Amendment regulatory takings claims are not ripe "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." 473 U.S. at 186. Yet even assuming *arguendo* that *Williamson County*'s final-decision rule applies to Opulent Life's claims,[7] it

---

[7] Whether *Williamson County* applies to RLUIPA and First Amendment challenges to land use decisions is an open question in this circuit. The Supreme Court has only applied *Williamson County*'s finality rule to regulatory takings claims. *See Palazzolo v. Rhode Island*, 533 U.S. 606 (2001); *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725 (1997); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992); *Yee v. City of Escondido*, 503 U.S. 519 (1992); *MacDonald, Sommer & Frates v. Yolo Cnty.*, 477 U.S. 340 (1986). We have gone a bit further, applying the finality requirement to ordinary takings claims, *Urban Developers LLC v. City of Jackson, Miss.*, 468 F.3d 281, 294–95 (5th Cir. 2006), and procedural due process claims that are "ancillary" to or "arise from" a takings claim. *See Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 223–26 (5th Cir. 2012) (summarizing circuit precedent and applying general ripeness principles, but declining to apply *Williamson County*, to find ripe a procedural due process claim that was not ancillary to a takings claim). Other circuits have applied *Williamson County* more broadly. *See, e.g., Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 349 (2d Cir. 2005) (citing cases from other circuits that apply *Williamson County* to due process and equal protection claims). The Second Circuit applies the Final-Decision Rule to RLUIPA and First Amendment claims, but only if a two-part threshold test is met. *See id.* at 350 ("Relatedly, we do not believe it necessary to distinguish the RLUIPA claim from the First Amendment Free Exercise claim when it comes to our ripeness inquiry."). The Sixth Circuit applies the final decision rule to RLUIPA and First Amendment claims, and has declined to decide whether or not to adopt the Second Circuit's threshold test. *See Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 541–42 (6th Cir. 2010) (distinguishing *Murphy* and therefore not deciding whether to adopt the threshold test); *see also id.* at 545 (Batchelder, C.J., dissenting) (endorsing *Murphy*'s threshold test). We take no position here regarding whether and when *Williamson County* may apply to RLUIPA and First Amendment challenges to land use decisions.

10

presents no barrier to our adjudicating Opulent Life's *facial* challenges to the ordinance. The Supreme Court has held *Williamson County* to be inapplicable to facial challenges. *See Yee v. City of Escondido*, 503 U.S. 519, 533–34 (1992) ("While . . . a claim that the ordinance effects a regulatory taking *as applied* to petitioners' property would be unripe for [failure to satisfy *Williamson County*], petitioners mount a *facial* challenge to the ordinance." (citation omitted)).

Although Holly Springs does not contest Article III ripeness, we briefly address the application of ordinary ripeness principles. *See Urban Developers LLC v. City of Jackson, Miss.*, 468 F.3d 281, 292 (5th Cir. 2006) (before reaching the merits we "must be convinced that the claim in question is ripe, even if neither party has raised the issue"). Opulent Life's facial challenges are easily ripe. First, they are fit for judicial decision because they raise pure questions of law. *See Triple G Landfills, Inc. v. Bd. of Comm'rs*, 977 F.2d 287, 289 (7th Cir. 1992) ("This lawsuit . . . mounts a facial attack upon the validity of the ordinance itself . . . . The issues posed are purely legal . . . . [T]he case is fit for judicial decision."). Second, Opulent Life would suffer hardship if review were delayed. Before Holly Springs amended its ordinance, Opulent Life already faced considerable hardship absent immediate judicial review. Compliance with Section 10.8 would have been onerous, and noncompliance would have meant forfeiting the larger meeting space Opulent Life has leased. Now Opulent Life would suffer even more acute hardship were review to be withheld. The amended ordinance bans Opulent Life from its leased property. Each day that passes without Opulent Life being able to occupy its new building is a day in which its religious free exercise is curtailed. *See* 42 U.S.C. § 2000cc-5(7)(B) ("The use . . . of real property for the purpose of religious exercise shall be considered to be religious exercise" under RLUIPA.). Opulent Life's facial challenges are ripe and that suffices for us to decide the merits of this interlocutory appeal.

No. 12-60052

### III.

Turning to the merits, we review the district court's denial of Opulent Life's preliminary injunction application for abuse of discretion. *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005). The prerequisites to obtaining a preliminary injunction are familiar. The applicant must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest. *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012). Each of these factors presents a mixed question of fact and law. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001). Factual findings are reviewed for clear error; legal conclusions are reviewed *de novo*; and a decision grounded in erroneous legal principles is reviewed *de novo. Id.*

Holly Springs argues that the district court's denial should be affirmed because it correctly concluded that Opulent Life has not shown a threat of irreparable harm. Holly Springs did not argue in its appellate brief that any of the other preliminary injunction factors support affirmance. Opulent Life argues, in contrast, that the district court's irreparable-harm determination was both legally and factually erroneous. Opulent Life further argues that it has established each of the four preliminary injunction requirements and thus urges us to order entry of the injunction.[8]

We address each of the preliminary injunction requirements sequentially.

---

[8] The United States has filed an *amicus curiae* brief in support of Opulent Life. The United States agrees with Opulent Life that the district court erred in finding no irreparable harm, and further agrees that Opulent Life has demonstrated a likelihood of success on the merits of its RLUIPA Equal Terms Clause challenge to Section 10.8. The United States stops short, however, of urging entry of a preliminary injunction at this juncture. Instead, it supports a remand for Holly Springs to present any evidence it can of how a preliminary injunction would harm its interests.

No. 12-60052

A.

We first consider whether Opulent Life has shown a substantial likelihood of success on the merits. Although Opulent Life has asserted several constitutional and RLUIPA claims, it focused its briefing on its claim under RLUIPA's Equal Terms Clause and advised that "this Court need not look beyond the Equal Terms Clause to find a likelihood of success on the merits."[9] The United States has followed suit. We accordingly limit our discussion to the Equal Terms Clause claim, without considering the merits of Opulent Life's other claims.

1.

In *Cutter v. Wilkinson*, 544 U.S. 709, 714–17 (2005), the Supreme Court described the history that prompted the enactment of RLUIPA. "RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with [Supreme Court] precedents." *Id.* at 714. The story begins with the Court's decision in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990). The *Smith* Court held that the Free Exercise Clause generally does not exempt religious conduct from burdens imposed by neutral laws of general applicability.[10] *Id.* at 878–82.

Congress responded to *Smith* by passing the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq. See Cutter*, 544 U.S. at 714. RFRA broadly prohibited both the federal government and the

---

[9] At oral argument, Opulent Life continued to focus on its Equal Terms Clause claim in arguing that it is likely to prevail on the merits in challenging the amended ordinance.

[10] *Smith* recognized two exceptions to this rule: (1) for "hybrid" claims, resting on "the Free Exercise Clause in conjunction with other constitutional protections," *id.* at 881–82, and (2) for claims brought in contexts that entail "individualized governmental assessment of the reasons for the relevant conduct" such as, in the unemployment compensation context, exemptions for those who refuse work with "good cause." *Id.* at 884.

states from substantially burdening a person's religious exercise—"even if the burden results from a rule of general applicability"—unless the government could demonstrate that the burden survives strict scrutiny.  42 U.S.C. § 2000bb-1.  Four years after RFRA's enactment, the Supreme Court invalidated it as applied to the states and their subdivisions.  *City of Boerne v. Flores*, 521 U.S. 507, 532–36 (1997) (holding that RFRA exceeded Congress's power under Section 5 of the Fourteenth Amendment).

Congress responded to *Flores* by enacting RLUIPA.  *Cutter*, 544 U.S. at 715.  "Less sweeping than RFRA . . . RLUIPA targets two areas."  *Id.*  Section 2 of RLUIPA addresses land use regulation.  42 U.S.C. § 2000cc.  Section 3, which is not at issue here,  protects the religious exercise of institutionalized persons. § 2000cc-1; *see also Cutter*, 544 U.S. at 713–14 (upholding Section 3 of RLUIPA as a permissible accommodation of religion that does not offend the Establishment Clause).  The statute includes a rule of construction, applicable to both Sections 2 and 3, that it "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."  42 U.S.C. § 2000cc-3(g).

RLUIPA expressly provides a cause of action for violations of its requirements: "A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." § 2000cc-2(a).  The phrase "appropriate relief" does not include money damages against states.  *Sossamon v. Texas*, 131 S. Ct. 1651, 1655, 1658–59 (2011) (holding that RLUIPA does not unambiguously abrogate the sovereign immunity of the states from damages claims).  By contrast, money damages are available under RLUIPA against political subdivisions of states, such as municipalities and counties.  *See, e.g.*, *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1168–69 (9th Cir. 2011) (holding that municipalities and counties may be liable for money damages under RLUIPA);

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 260–61 (3d Cir. 2007) (same); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280–81 (1977) (recognizing that political subdivisions of states do not enjoy Eleventh Amendment immunity).   Under Supreme Court precedent, money damages are available against municipal entities unless "Congress has given clear direction that it intends to *exclude* a damages remedy" from a cognizable cause of action.  *Sossamon*, 131 S. Ct. at 1660 (citing *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 70–71 (1992)).   RLUIPA contains no indication, much less clear direction, that it intends to exclude a money damages remedy.   Thus, municipalities and counties may be held liable for money damages under RLUIPA, but states may not.

Section 2 of RLUIPA, which protects religious land uses and is at issue in this case, contains two subsections that limit land-use regulations.  The first subsection contains the Substantial Burden Clause, which prohibits the imposition or implementation of a land use regulation in a manner that imposes a "substantial burden" on the religious exercise of a person, assembly, or institution unless the government can show that the regulation furthers a "compelling governmental interest" by "the least restrictive means." § 2000cc(a). The second subsection contains three provisions under the heading "Discrimination and exclusion." § 2000cc(b). The Equal Terms Clause prohibits imposing or implementing a land use regulation so as to treat a religious assembly "on less than equal terms" than a nonreligious assembly. § 2000cc(b)(1).    The Nondiscrimination Clause prohibits imposing or implementing a land use regulation so as to discriminate against an assembly or institution on the basis of religion.  § 2000cc(b)(2).   The third provision concerns "Exclusions and limits" and contains two subparts that prohibit: (A) "totally exclud[ing] religious assemblies from a jurisdiction"; and (B) imposing or implementing a land use regulation that "unreasonably limits

religious assemblies, institutions, or structures within a jurisdiction." § 2000cc(b)(3). Although Opulent Life has asserted violations of each of these provisions (except the total exclusion subpart), we confine our discussion to its Equal Terms Clause claim.

The statutory text of the Equal Terms Clause provides: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." § 2000cc(b)(1). There can be no serious dispute that Holly Springs is a "government" within the meaning of the statute, *see* § 2000cc-5(4) (defining "government" to include, *inter alia*, "a State, county, municipality, or other governmental entity created under the authority of a State"); that the provisions of its zoning ordinance at issue (both Section 10.8 and the newly adopted ban on religious facilities) are "land use regulation[s]," *see* § 2000cc-5(5) (defining "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land . . ."); or that Opulent Life is a "religious assembly or institution." Thus, the dispositive issue is whether the ordinance facially treats Opulent Life "on less than equal terms with a nonreligious assembly or institution." § 2000cc(b)(1). Before considering this determinative statutory language, we address the application of RLUIPA's burden-shifting provision.

Under RLUIPA, the government bears the burden of persuasion once a religious plaintiff establishes a prima facie case of a violation:

> If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of [Section 2 of RLUIPA], the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

§ 2000cc-2(b).  The Ninth Circuit has held that an ordinance that expressly differentiates religious land uses from nonreligious land uses establishes a prima facie case for a facial Equal Terms Clause claim.  *See Centro Familiar*, 651 F.3d at 1171 ("[T]he express distinction drawn by the ordinance establishes a prima facie case for unequal treatment.").  We agree.  Because both the old and new versions of the ordinance expressly distinguish between religious and nonreligious land uses, Opulent Life has established a prima facie case, so Holly Springs has the burden of persuasion on each element of the Equal Terms Clause claim.

We now turn to the critical statutory phrase "on less than equal terms with a nonreligious assembly or institution."  Our leading case construing this language is *Elijah Group, Inc. v. City of Leon Valley*, 643 F.3d 419 (5th Cir. 2011).  We explained in *Elijah Group* that this statutory language "requires that the religious institution in question be compared to a nonreligious counterpart, or 'comparator.'" *Id.* at 422.  We described the differing approaches of four of our sister circuits to this issue, but declined to choose among them.  *Id.* at 422–24 & n.19.  Instead, it sufficed in that case to observe that a plaintiff must "show more than simply that its religious use is forbidden and some other nonreligious use is permitted.  The 'less than equal terms' must be measured by the ordinance itself and the criteria by which it treats institutions differently."  *Id.* at 424.  We concluded that the ordinance at issue in *Elijah Group* violated the Clause because it "treats the Church on terms that are less than equal to the terms on which it treats similarly situated nonreligious institutions."  *Id.*

The approaches of our sister circuits to facial Equal Terms Clause challenges fall "roughly into two camps."  *Centro Familiar*, 651 F.3d at 1169 n.25.  In one camp is the Eleventh Circuit, which treats all land use regulations that facially differentiate between religious and nonreligious institutions as violations of the Clause, but will nonetheless uphold such a regulation if it

survives strict scrutiny review. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1231–35 (11th Cir. 2004). The other camp includes the Third, Seventh, and Ninth Circuits. Those circuits hold that a violation of the Equal Terms Clause occurs only if a religious institution is treated less well than a similarly situated nonreligious comparator.[11] The Third Circuit requires the comparator to be "similarly situated *as to the regulatory purpose*." *Lighthouse Inst.*, 510 F.3d at 266. The Seventh and Ninth Circuits require a comparator that is similarly situated with respect to "accepted zoning criteria." *Centro Familiar*, 651 F.3d at 1172–73; *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 371–73 (7th Cir. 2010) (en banc).

As Opulent Life concedes in its brief, by requiring a similarly situated comparator, our precedent rules out the Eleventh Circuit's approach, and places us in the latter camp with the Third, Seventh, and Ninth Circuits.[12] *See Elijah Group*, 651 F.3d at 424. But our precedent calls for a test that differs slightly from the Third Circuit's "regulatory purpose" test and the Seventh and Ninth

---

[11] As we observed in *Elijah Group*, the Second Circuit has followed a similar approach in an as-applied challenge, "identif[ying] a comparator that is similarly situated for all 'functional intents and purposes' of the regulation." 643 F.3d at 423 (quoting *Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 626 F.3d 667 (2d Cir. 2010)). The Second Circuit has not adopted a test for facial challenges, and even the Eleventh Circuit requires a similarly situated comparator in as-applied challenges. *See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1311 (11th Cir. 2006) ("[A] neutral statute's *application* may violate the Equal Terms provision if it differentially treats *similarly situated* religious and nonreligious assemblies.").

[12] Although we do not follow the Eleventh Circuit in applying strict scrutiny review to Equal Terms Clause claims, strict scrutiny is the proper test for claims under the Substantial Burden Clause. *See* 42 U.S.C. § 2000cc(a) (expressly providing for strict scrutiny review). The omission of strict scrutiny language from the Equal Terms Clause, *see* 42 U.S.C. § 2000cc(b)(1), immediately following the inclusion of such language in the prior subsection (the Substantial Burden Clause), is another reason not to apply strict scrutiny review to Equal Terms Clause claims. *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)).

No. 12-60052

Circuits' "accepted zoning criteria" test.[13] In this circuit, "[t]he 'less than equal terms' must be measured by the ordinance itself and the criteria by which it treats institutions differently." *Id.* In accord with this instruction, and building on the similar approaches of our sister circuits, we must determine: (1) the regulatory purpose or zoning criterion behind the regulation at issue, as stated explicitly in the text of the ordinance or regulation; and (2) whether the religious assembly or institution is treated as well as every other nonreligious assembly or institution that is "similarly situated" with respect to the stated purpose or criterion. Where, as here, the religious assembly or institution establishes a prima facie case, the government must affirmatively satisfy this two-part test to bear its burden of persuasion on this element of the plaintiff's Equal Terms Clause claim.

2.

As Holly Springs conceded at oral argument, the now-repealed Sections 10.86 and 10.89 plainly violated the Equal Terms Clause. Those provisions

---

[13] Several jurists have argued that there is "little real contrast in basic approach or result" between the "regulatory purpose" and "accepted zoning criteria" tests. *River of Life Kingdom Ministries*, 611 F.3d at 374 (Cudahy, J., concurring); *id.* at 386 (Sykes, J., dissenting) ("The distinction between 'accepted zoning criteria' and the 'regulatory purpose' of exclusionary zoning is nonexistent or too subtle to make any difference in individual equal-terms cases. Zoning decisions are *always* tied to accepted land-use 'criteria.'"); *see also Centro Familiar*, 651 F.3d at 1173 n.46 (citing Judge Cudahy's observation approvingly).

We need not interject ourselves into that discussion. For our purposes here, we note that to the extent either test could be read as permitting courts to consider regulatory objectives or zoning criteria that are not expressed in the text of the ordinance or land use regulation at issue, we may not follow suit. *See Elijah Group*, 651 F.3d at 424 ("The 'less than equal terms' must be measured by the ordinance itself and the criteria by which it treats institutions differently."); *compare River of Life Kingdom Ministries*, 611 F.3d at 371 (majority opinion) (criticizing the "regulatory purpose" test for being too "subjective and manipulable," inviting "speculation concerning the reason behind exclusion of churches" and "self-serving testimony by zoning officials and hired expert witnesses") *with id.* at 376–77 (Williams, J., concurring) (endorsing the "regulatory purpose" test and criticizing the majority's test as "present[ing] a risk of self-serving testimony just as the majority believes the 'regulatory purpose' approach would").

No. 12-60052

imposed onerous burdens on churches not imposed on any other type of assembly or institution, similarly situated or not. Specifically, those two provisions required churches, and only churches: (1) to conduct a survey to find all neighboring property owners within a 1300-foot radius and to seek and obtain approval from sixty percent of them; and (2) to obtain discretionary approval from the mayor and Board of Aldermen. On the face of the ordinance, the only "criteri[on] by which it treats institutions differently," *Elijah Group*, 643 F.3d at 424, with respect to these burdensome requirements, is whether the institution is a church. This differential treatment of churches cannot be justified by any regulatory purpose or zoning criterion set forth in the ordinance. The church-specific burdens in Sections 10.86 and 10.89 were unlawful under RLUIPA.[14]

We now turn to Holly Springs's newly adopted ban on religious facilities on the courthouse square. The ordinance draws an express distinction between "[c]hurches, temples, synagogues, mosques, and other religious facilities" on the one hand, and various nonreligious institutions on the other hand, for purposes of designating permitted and nonpermitted uses in the "Business Courthouse Square District." Consequently, and as discussed above, Opulent Life has established a prima facie Equal Terms Clause violation, *see Centro Familiar*, 651 F.3d at 1171 ("[T]he express distinction drawn by the ordinance [between religious and non-religious institutions] establishes a prima facie case for unequal treatment."), and Holly Springs has the burden of proving the validity of the ban, *see* 42 U.S.C. § 2000cc-2(b).

---

[14] The other provisions of Section 10.8 are not so plainly invalid. Those provisions required churches to conform to standards that embodied more typical zoning criteria such as traffic flow and noise levels. At least some of those standards, *e.g.* Section 10.85, are made applicable to nonreligious institutions through other provisions of the ordinance. We need not resolve the validity of these provisions, however, because both sides agree that two key provisions of Section 10.8 violated RLUIPA, and Holly Springs has repealed Section 10.8 in its entirety, thereby mooting Opulent Life's claim for injunctive relief against that section of the ordinance.

No. 12-60052

To bear its burden, Holly Springs must first identify the regulatory purpose or zoning criterion that explains the religious facilities ban, as stated explicitly in the text of the ordinance, and then show that it has treated religious facilities on equivalent terms as all nonreligious institutions that are similarly situated with respect to that stated purpose or criterion. The amended ordinance includes a description of the purpose of the Business Courthouse Square District: "to designate the area . . . for certain retail, office and service uses which will complement the historic nature and traditional functions of the court square area as the heart of community life." Insofar as this language can be read as purporting to create a commercial district, that justification fails because other noncommercial, non tax-generating uses are permitted in the district, as Holly Springs conceded at oral argument. For instance, the ordinance permits libraries, museums, art galleries, exhibitions, and "similar facilit[ies]" on the courthouse square. *Elijah Group*, 643 F.3d at 423–24 (rejecting the city's "retail corridor" justification where the ordinance excluded churches but permitted "many nonreligious, *nonretail* buildings" including private lodges and clubs); *River of Life Kingdom Ministries*, 611 F.3d at 374 ("[S]hould a municipality create what purports to be a pure commercial district and then allow other uses, a church would have an easy victory if the municipality kept it out."). In addition, to the extent that the stated purpose for the district could be read to suggest that the "heart of community life" in Holly Springs is consistent with a variety of nonreligious civic uses, but not religious uses, that inherently discriminatory regulatory purpose would likewise fail to justify the ban.

Beyond making these initial observations, however, we do not address whether Holly Springs can justify its exclusion of religious facilities from the

21

No. 12-60052

courthouse square under the test we have adopted.[15] Mindful that Holly Springs has not yet had an opportunity to come forward with the zoning criteria or regulatory objectives that it believes justify this ban, we leave it for the district court on remand to determine, in the first instance, whether Opulent Life is likely to succeed on the merits of its facial claims against the amended ordinance.

B.

We now proceed to the second preliminary injunction requirement—that Opulent Life show a substantial threat of irreparable harm if the injunction is not granted. The district court denied the injunction solely on the ground that Opulent Life cannot satisfy this requirement. It reached this conclusion based on its determination that Opulent Life's ability freely to exercise its religion is not currently being harmed because its present meeting space is adequate. Opulent Life argues that this factual determination is clearly erroneous and further argues that it has suffered irreparable harm as a matter of law. The United States agrees with Opulent Life. Holly Springs argues that the district court's analysis was sound and should be affirmed.

Importantly, Holly Springs's amendment to its zoning ordinance does not matter for purposes of our review of the district court's irreparable harm determination. Opulent Life made clear at oral argument that, in light of the

---

[15] At oral argument, Holly Springs attempted to defend the ban by repeatedly stressing that it only covers one zoning district and that religious facilities are allowed to meet elsewhere in Holly Springs. Although the limited reach of the ban precludes a violation of RLUIPA's proscription against imposing "a land use regulation that . . . totally excludes religious assemblies from a jurisdiction," 42 U.S.C. § 2000cc(b)(3)(A), the ban's limited application is irrelevant to Opulent Life's claim under the Equal Terms Clause. That clause manifestly protects religious assemblies and institutions from unequal treatment in *every* zoning district within a jurisdiction. *See Elijah Group*, 643 F.3d at 424 (finding a violation of the Equal Terms Clause where a city treated churches differently than private clubs in B-2 zones); *cf. Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." (internal quotation marks omitted)).

recent amendment to the ordinance, it now seeks the preliminary injunction of Holly Springs's ban on religious facilities operating on the courthouse square. (Section 10.8 cannot be enjoined, of course, because it has been repealed.) Regardless of the zoning obstacle, the harm asserted by Opulent Life is its inability to occupy and use its leased property.[16] We now consider whether the district court properly analyzed Opulent Life's asserted irreparable harm.

We conclude that the district court erred and that Opulent Life has demonstrated that it will suffer irreparable harm absent the injunction it seeks. Most basically, Opulent Life has satisfied the irreparable-harm requirement because it has alleged violations of its First Amendment and RLUIPA rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise. *See* 42 U.S.C. § 2000cc-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."); *see also Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 795 (D. Md. 2008) ("[T]he infringement of one's rights under RLUIPA constitute[s] irreparable injury." (citing *Elrod*, 427 U.S. at 373)). In the closely related RFRA context (the predecessor statute to RLUIPA), courts have recognized that this

---

[16] If anything, the amendment to the zoning ordinance adds urgency to Opulent Life's preliminary injunction motion because the ordinance now makes it impossible, instead of just difficult, for Opulent Life to obtain permission to operate on its leased property.

same principle applies. *See Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("[C]ourts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA.").

Holly Springs resists a straightforward application of this principle by attempting to distinguish *Elrod*.[17]  To do so, Holly Springs relies on the Third Circuit's decision in *Hohe v. Casey*, 868 F.2d 69 (3d Cir. 1989), which reasoned that while the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod*, 427 U.S. at 373, "the assertion of First Amendment rights does not automatically require a finding of irreparable injury."  868 F.2d at 72–73.  "Rather the plaintiffs must show a chilling effect on free expression."  *Id.* at 73 (internal quotation marks omitted). But even if we were to adopt the reasoning of *Hohe*, its facts make clear that it sets forth only a narrow exception to the *Elrod* principle that is inapplicable here.  In *Hohe*, the plaintiffs challenged the constitutionality of certain union fees.  *Id.* at 71.  Pending final disposition of the challenge, the union escrowed the disputed fees to ensure protection of the challengers' interest against compelled speech.  *Id.* at 72.  Thus, the only asserted harm by the challengers was that "the mere deduction and collection of the fees . . . deprived [them] of money they might use to support their own political, ideological, or other purposes."  *Id.* 73.  This minor and temporary monetary harm does not match Opulent Life's exclusion from its leased property, which Opulent Life asserts significantly impairs its free exercise of religion.  *Elrod*, not *Hohe*, governs this

---

[17] Holly Springs also contends that Opulent Life waived this argument.  The record refutes this contention.  Opulent life made this very argument in its memorandum in support of its motion for preliminary injunction.

case.[18] Opulent Life has alleged violations of its First Amendment and RLUIPA rights and thereby satisfied the irreparable injury requirement.

Moreover, even assuming *arguendo* that we were required to consider the specific evidence in the record, we would still find irreparable harm. The record is replete with evidence of irreparable harm to Opulent Life's ability to freely exercise its religion. Opulent Life avers that its current building is too small for its present membership. The building cannot accommodate Opulent Life's community service programs—programs Opulent Life considers essential to its religious mission. The building also allows no room for Opulent Life to grow, and has already prevented would-be members from joining and limited Opulent Life's ability to welcome visitors. This frustrates Opulent Life's religious mission. Moreover, the sufficiency of this evidence is buoyed by the rule that courts may not second-guess a religious entity's sincere belief that certain activities are central to or required by its religion. *See Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144 n.9 (1987) ("In applying the Free Exercise Clause, courts may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs."); *Merced v. Kasson*, 577 F.3d 578, 590 (5th Cir. 2009) ("The judiciary is ill-suited to opine on theological matters, and should avoid doing so." (citing *Smith*, 494 U.S. at 887)).

---

[18] In lieu of *Elrod*, Holly Springs also urges us to follow an unpublished Sixth Circuit decision, which held that a church's religious exercise was not substantially burdened by the denial of its application for a permit to build a larger building. *See Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729 (6th Cir. 2007) (unpublished). According to Holly Springs, *Living Water* supports the conclusion that Opulent Life has not shown irreparable harm. To justify reliance on this substantial-burden case, Holly Springs cites authority for the proposition that substantial burdens amount to irreparable harm and then concludes "[c]onversely, if no substantial burden, then no irreparable injury." But this argument fails because it rests on a basic logical fallacy. A substantial burden may well be (and probably is) sufficient to establish irreparable injury, but it surely is not necessary. *Living Water* does not affect our conclusion that Opulent Life has shown irreparable harm.

This evidence of irreparable harm refutes the district court's determination. Indeed, the district court's brief analysis does not even address this abundant evidence of ongoing harm to Opulent Life's religious practice. In addition, the district court's analysis is flawed because under its logic it would be almost impossible for Opulent Life ever to show irreparable harm. The district court's reasoning would not support an irreparable harm finding until Opulent Life's membership *exceeds* its building's capacity, but Opulent Life insists that it cannot grow without a larger building, and supports this assertion with record evidence. In sum, our review of the record leaves us with a firm conviction that the district court erred in finding that Opulent Life's members are not "currently being deprived of the right to freely exercise their religion." *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982) (a district court clearly errs in its factual findings if "an appellate court is left with the definite and firm conviction that a mistake has been committed" (internal quotation marks omitted)).

Moreover, Holly Springs's responses to this evidence are unpersuasive. First, Holly Springs boldly proclaims in its brief that Opulent Life "concedes its ability to function meaningfully in its current location." But this assertion is belied by all of the record evidence just discussed and, in any event, Holly Springs does not state where Opulent Life made this purportedly critical concession. Second, Holly Springs argues that Opulent Life's "long litigation delay" suggests it is not suffering irreparable harm. *See* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("A long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). Opulent Life dismisses this argument as frivolous. Whether frivolous or not, it is unconvincing on the these facts. Not only is it in tension with Holly Springs's primary contention that Opulent Life's

26

claims are unripe, but worse, the majority of Opulent Life's four-month delay was caused by *Holly Springs's* refusal to produce a copy of its zoning ordinance and the consequent necessity that Opulent Life resort to a public records request to obtain a copy. Third, Holly Springs offers to present evidence on remand "disputing Pastor DeBerry's comparisons of the Marshall Baptist Center with the leased building on the town square." Most pertinently, Holly Springs states that Marshall Baptist Center is zoned as an office building with a maximum occupancy of ninety-four, and that Opulent Life's "Facebook page displays images of an event held in a room with musical equipment, a long banquet table, and approximately 50 - 60 chairs." But even assuming *arguendo* that Holly Springs can establish these facts, they do not discredit Pastor DeBerry's sworn assertion that the Marshall Baptist Center can accommodate only twenty to twenty-five people during customary religious activities. Nor would these facts undercut Opulent Life's other record evidence that its current building is inadequate for its present membership.

Finally, another independent reason that Opulent Life has established a substantial threat of irreparable harm is that it will lose its lease if it is not allowed to operate in its leased property. "The deprivation of an interest in real property constitutes irreparable harm." *Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 617 F. Supp. 2d 201, 215 (S.D.N.Y. 2008), *aff'd*, 626 F.3d 667 (2d Cir. 2010). This threat has become significantly more imminent since Opulent Life filed its notice of appeal, as explained in Opulent Life's motion to expedite its appeal, which was granted in May 2012. Opulent Life attached to that motion an affidavit from its lessor, Rowland Huff. In it Mr. Huff explains that if Opulent Life is not allowed to occupy the property soon, he will be forced to terminate the lease and to find another lessee because he is suffering financial difficulties and is not currently receiving rental payments from Opulent Life under the terms of the lease.

No. 12-60052

Opulent Life has met its burden of showing a substantial threat of irreparable injury. The district court abused its discretion in reaching a contrary conclusion.

C.

The third preliminary injunction factor requires Opulent Life to show that, absent an injunction, its threatened injury outweighs any harm Holly Springs will suffer as a result of the injunction. We have just concluded that Opulent Life's harm is irreparable; hence, Holly Springs would need to present powerful evidence of harm to its interests to prevent Opulent Life from meeting this requirement. Nevertheless, Holly Springs argues persuasively that it is entitled to put on evidence before a preliminary injunction may issue against it.[19] This is especially so given our conclusion that the case should be remanded to allow the district court the first opportunity to decide whether Opulent Life is likely to succeed on the merits of its claims against the new ordinance.

Holly Springs asserts its right to present evidence in the district court based on Fed. R. Civ. P. 65. Rule 65(a)(1) provides that a "court may issue a preliminary injunction only on notice to the adverse party." We have held that the "Rule's notice requirement necessarily requires that the party opposing the preliminary injunction has the opportunity to be heard and to present evidence." *Harris Cnty., Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 325 (5th Cir. 1999) ("The notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition.") (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local No. 70*, 415 U.S. 423, 434 n.7 (1974)). Moreover, "[c]ompliance with [R]ule 65(a)(1) is mandatory." *Parker v. Ryan*, 960 F.2d 543, 544 (5th Cir. 1992). Here, Holly Springs never

---

[19] The United States agrees that a remand is appropriate to allow Holly Springs to present evidence on the issue of the harm an injunction would cause it.

28

had an opportunity to present evidence or to be heard in the district court because the court denied the preliminary injunction motion before Holly Springs's response was due.  Under these circumstances, the proper remedy is to remand to the district court.  *Cf. Harris Cnty.*, 177 F.3d at 326 ("[A] preliminary injunction granted without adequate notice and a fair opportunity to oppose it should be vacated and remanded to the district court.").  Remand is necessary to allow Holly Springs to present evidence concerning the harm it will suffer if a preliminary injunction is entered, as well as to allow both sides to address, and to present evidence concerning, Opulent Life's claims challenging the validity of the recent amendments to the ordinance.

### D.

Fourth, Opulent Life must show that a preliminary injunction will not disserve the public interest.  "[I]njunctions  protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *accord Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where a law violates the First Amendment "the public interest was not disserved by an injunction preventing its implementation").  This principle applies equally to injunctions protecting RLUIPA rights because, as discussed, RLUIPA enforces the First Amendment and must be construed broadly.  Accordingly, Opulent Life will have met this requirement if on remand it is able to establish a likelihood of success on the merits.

### IV.

In sum, the issues on remand include but are not limited to: (1) whether Opulent Life is likely to succeed on its claims challenging the validity of the newly adopted religious facilities ban; (2) whether the harm Opulent Life will suffer absent a preliminary injunction outweighs the harm an injunction will cause Holly Springs; (3) the amount of actual damages Opulent Life suffered on

No. 12-60052

account of Sections 10.86 and 10.89, which violated RLUIPA; and (4) at the district court's discretion, whether Opulent Life should be awarded reasonable attorneys fees as a prevailing party under 42 U.S.C. § 1988(b).[20]

V.

For the foregoing reasons, we VACATE the district court's order denying Opulent Life's motion for a preliminary injunction and REMAND for further proceedings consistent with this opinion.

---

[20] Even if Opulent Life proves only nominal damages, it is a prevailing party potentially eligible for fees under 42 U.S.C. § 1988(b). *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992) ("We therefore hold that a plaintiff who wins nominal damages is a prevailing party under § 1988.").